**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000025
26-AUG-2016
01:18 PM**

NO. CAAP-12-0000025

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

GORAN PLEHO, LLC, a Hawaii Limited Liability Company
(dba Resorts Limousine Services), GORAN PLEHO,
and ANA MARIA PLEHO, Plaintiffs-Appellants/Cross-Appellees, v.
DAVID W. LACY, LACY AND JACKSON, LLLC, a Hawaii Limited
Liability Law Company, Defendants-Appellees/Cross-Appellants,
and DRAGAN RNIC, JOHN DOES 1-X, JANE DOES 1-X, and
DOE ENTITIES 1-X, Defendants-Appellees

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 06-1-101K)

AMENDED MEMORANDUM OPINION
(By: Nakamura, Chief Judge, Leonard and Ginoza, JJ.)

This appeal arises out of the sale of Resorts Limousine Services (**RLS**), a limousine service located on Hawaiʻi Island, by Defendant/Appellee Dragan Rnic (**Rnic**) to Plaintiff/Appellant/Cross-Appellee Goran Pleho, LLC (**GPLLC**), a Hawaiʻi limited liability company. Defendant/Appellee/Cross-Appellant David W. Lacy (**Lacy**) provided legal representation to one or more of the parties in the transaction and drafted the relevant documents. Following the sale, Plaintiffs/Appellants/Cross-Appellees GPLCC, Goran Pleho (**Goran**), and Ana Maria Pleho (**Maria**) (collectively, the **Pleho Parties**) brought claims regarding the sale against

Rnic, Lacy, and Lacy's law firm, Lacy and Jackson, LLLC (**L&J**), as well as legal malpractice claims against Lacy and L&J (collectively, the **Lacy Parties**). GPLLC's legal malpractice claims eventually went to trial, resulting in a jury verdict in favor of the Lacy Parties.

The Pleho Parties appeal from the judgment (**Judgment**) entered by the Circuit Court of the Third Circuit (**Circuit Court**),[1] on January 9, 2012, in favor of Rnic and the Lacy Parties on all claims asserted by the Pleho Parties. The Lacy Parties cross-appeal from a July 8, 2011 order denying the Lacy Parties' April 21, 2011 Motion in Limine No. 2, which pertained to the trial on GPLLC's legal malpractice claims.

As set forth below, we affirm in part, vacate in part, and remand for further proceedings.

I.    BACKGROUND

A.    The Sale of RLS

In March or April of 2005, Rnic approached Goran, whom he had met in Las Vegas in 2000 or 2001, about possibly purchasing RLS. In June 2005, Goran and Maria (the **Plehos**) flew from Las Vegas to Hawai'i to look at RLS. Rnic showed the Plehos the RLS office and some of the cars, and the Plehos asked Rnic questions about RLS. The Plehos returned to Las Vegas without purchasing RLS. Maria testified at deposition that she and Goran discussed making an offer to purchase RLS after they returned home.

---

[1]    The Honorable Ronald Ibarra presiding.

Rnic had previously talked to other potential buyers for RLS, but none of them had wanted to enter into a deal until the Public Utilities Commission (**PUC**) license for RLS was transferred from Rnic to the buyer. Rnic discussed this "stumbling block" with his acquaintance Donald Rullo (**Rullo**), and Rullo offered to "act as an intermediary, purchase the company for cash [from Rnic], and then resell the company six months later" once the PUC license had transferred.

Although Rullo denied ever retaining Lacy to represent him in connection with his interest in acquiring RLS, he testified that if he had gone through with the deal, he "would have asked [Lacy] to draft documents" as a "scribner [sic], a document generator." On June 16, 2005, Rnic and Rullo signed a purchase and sale agreement for RLS in the amount of $800,000.[2] This sale apparently did not close.

After further conversations with Rnic about RLS, the Plehos and their children flew back to Hawaiʻi in July 2005. Rnic told Goran that RLS was making a lot of money, that business was booming, and that in 2005 "he's on his way to get $1.6 million gross, with about $800,000 that would be net." Rnic told Goran that RLS's cars were very clean, that there was high demand

---

[2]     The agreement stated, in relevant part:

> Mr. Rullo has been in contact and spoken at length with potential buyers for RLS, including potential buyers introduced to Mr. Rullo by [Rnic]. Mr. Rullo may or may not have purchase commitments verbal, or in writing for the company at substantially more money than he is offering for the company. Mr. Rnic does not wish to enter into a listing agreement for the company with Red Time Realty LLC. Mr. Rnic represents that he is interested in a "quick" sale and is in agreement to accept substantially less than the possible potential value of the company.

from residential areas around the resorts, and that the possibility for expansion to other islands was high.  Rnic also gave Goran some profit and loss statements and a partial tax return from 2004.

On July 11, 2005, Rnic, Lacy, Goran, and Maria met regarding the sale, and Rnic introduced Lacy to the Plehos as his (Rnic's) attorney.  Lacy testified during his deposition that he remembered telling Goran that he should have his own attorney, but Rnic said that he (Rnic) did not want a lawyer, and that Lacy should be Goran's lawyer.  Lacy also testified:

> And I thought about it a moment.  And all of the terms and conditions of the contract were already agreed upon.  It was a matter of actually writing out the contract.  And so I -- I don't recall exactly how it happened, but I told Mr. Pleho I could represent him if he wanted me to.

Sometime thereafter, Lacy also agreed to represent GPLLC in the purchase of RLS.  Goran testified at his deposition that he knew that Lacy was Rnic's attorney when he retained Lacy, but that he did not know the extent of Lacy's representation of Rnic with regard to RLS.  He also testified that he expected that Lacy would protect his and Maria's interests.

On July 12, 2005, Lacy emailed certified public accountant (**CPA**) Ron Dolan (**Dolan**) regarding the transaction:

> I have a question for a client who may need an accountant later (or sooner for that matter).  The seller owns a limousine service that does very well working the resorts, and the buyer is a long-time friend of his from Las Vegas.  The price is $1.5M, and the problem is the PUC license as the seller has the PUC license in his individual name thus he cannot transfer it without a delay of three or four months. . . . [T]he buyer owns three rental houses in Las Vegas that he is giving to the seller as a down payment - the equity is about $378,000 or so in the houses.  The remainder will be paid by monthly payments over a 5 year period or so with security being the vehicles.  The seller wants to leave immediately, which means in the short term we'll need to do something creative with the buyer taking over the company, probably by a management agreement or

4

something. On the other hand the buyer wants to transfer the properties to the seller immediately (and the seller is fine with this and can, I believe, even pay off the existing mortgages, forestalling any problems with due on sale clauses). I'm kind of struggling about how best to do all of this with the delay in transferring the PUC license and wanted to talk it over with you so I also don't run into tax problems.

On July 14, 2005, Lacy emailed Dolan, stating that he had told the Plehos that they should speak with Dolan before closing the deal, and Lacy emailed Dolan again on July 15, 2005, stating that "[e]verybody seems to be in a hurry and [the Plehos] seem to be very trusting of [Rnic], who they've known for years, so it may be that you just give [the Plehos] some questions to ask [Rnic]." Lacy testified at his deposition that no appraisal was done before signing the Sale Agreement because "[Goran] didn't wish to have [an appraisal] done. He wanted to close." Lacy also testified that he himself did not know how much RLS was worth on July 25, 2005. None of the parties ever conducted an appraisal, and neither Lacy nor Rnic mentioned the prior potential sale of RLS to Rullo.

It appears that on February 9, 2006,[3] Goran signed, on behalf of GPLLC, a back-dated engagement letter from L&J addressed to GPLLC, which described L&J's representation as "general representation" (**Engagement Letter**). Earlier, on July 19, 2005, GPLLC had filed its articles of incorporation. Goran signed GPLLC's operating agreement as its sole member on July 26, 2005.

---

[3] The letter was dated August 9, 2005. However, the Pleho Parties submit that Lacy did not send the Engagement Letter to Goran on August 9, 2005, but instead presented the backdated letter to Goran for his signature on February 9, 2006.

On July 25, 2005, Rnic and GPLLC (by Goran) entered into a Sale of Assets Agreement (**Sale Agreement**) for RLS with a purchase price of $1.5 million. Under the Sale Agreement, "Goran Pleho, principal of [GPLLC]" agreed to transfer three parcels of Las Vegas real property (**Properties**) worth $378,000 to Rnic. GPLLC also agreed to execute a Promissory Note (**Promissory Note**) for the balance, and to the placement of liens in favor of Rnic on RLS's assets as security.

The Sale Agreement provided, *inter alia*:

> [Rnic] and [GPLLC] acknowledge that this Agreement cannot close until [Rnic's] PUC license is transferred to [GPLLC], which will take at least three to four months. Therefore, until the transfer of [Rnic's] PUC license to [GPLLC], all consideration in this Agreement is in exchange for [GPLLC's] management of [Rnic's] business pursuant to the Resorts Limousine Service Management Contract of even date herewith.

Article 2.1 of the Sale Agreement provided that "[t]he transfer of Assets shall take place upon transfer of [Rnic's] PUC license to [GPLLC]." Thus, the transfer date would be the effective closing date of the sale.

Article 7.1 provided that, as a condition precedent to closing, "on or prior to the Closing Date[,]" GPLLC would have "completed a customary and satisfactory due diligence investigation." Article 11.1 provided a means for GPLLC to unilaterally terminate the Sale Agreement prior to the closing date:

> 11.1 Termination. This Agreement may be terminated prior to the Closing Date only:
> . . . .
>
> (c)  By [GPLLC] if [Rnic]:
>
> (i)  Breaches any of his representations or warranties in any material respect herein; or

> (ii) [Rnic] fails to perform in any material respect any of his covenants, agreements, or obligations under this Agreement, and any such breach or failure is not cured within thirty (30) days after written notice from [GPLLC]; or
>
> (iii) [Rnic] has made one or more substantial material and intentional misrepresentations in respect of the Business or the Assets.

Later on July 25, 2005, Rnic and GPLLC (by Goran) signed the Resorts Limousine Service Management Contract (**Management Contract**). GPLLC (by Goran) also executed a Promissory Note (**Promissory Note**) in favor of Rnic for the $1,122,000 balance of the purchase price.

On August 4, 2005, Rnic, Goran, and Maria executed a Residential Purchase Agreement (**Residential Purchase Agreement**) under which Goran and Maria agreed to sell the Properties to Rnic. Both Goran and Maria were listed as "Sellers," although only Goran signed and initialed the document.

On August 11, 2005, Rnic filed an application for transfer of the PUC license for RLS to GPLLC. On December 6, 2005, the PUC sent a letter to Rnic and GPLLC informing them that the application for transfer had been approved, but that further documentation needed to be submitted within 120 days, or by April 6, 2006, in order to complete it.

On February 24, 2006, Rnic sent a letter to "Goran and [Maria]" requesting the February 2006 payment on the Promissory Note, which was overdue. Goran forwarded the letter to Lacy, asking for advice and stating that he had discovered problems with RLS.

On February 28, 2006, Rnic sold one of the three Properties.

On February 28, 2006, Goran emailed Lacy, discussing his concerns about Rnic's representations and stating:

> [T]he buyer is looking for the contract recision [sic], return of the down payment and damages from relocation, and will turn the evidence to the PUC. We maybe will look into a settlement out of court, or possible adjustment on the purchase price, with all the leans [sic] taken off unconditionally (seller received more then [sic] 3 times worth of cars in the down payment thru [sic] home equity), and all the payment [sic] are to be suspended until the outcome is concluded.

On March 8, 2006, Goran sent another email to Lacy raising additional concerns about RLS and Rnic.

On March 10, 2006, Goran received written approval from the PUC to "initiate [his] motor carrier service[.]"

On March 13, 2006, Lacy sent the January 2006 principal and interest payments to Rnic on behalf of GPLLC, along with a letter suggesting either a rescission of the Sale Agreement or a renegotiation of the purchase price. This payment was apparently the last payment GPLLC made on the Promissory Note.

On March 31, 2006, Rnic's attorney sent Lacy a demand letter asking for the overdue February 2006 payment. The letter stated, in relevant part:

> Your client did not complain about any misrepresentations concerning the condition of the business for over six months after he began operating it, and only after (1) he became concerned about when the PUC would transfer the license, and (2) he was two months behind on his monthly payment obligations to Mr. Rnic.
>
> Mr. Rnic disputes any allegations that he misrepresented the value of the vehicles, the finances of the company, or the list of accounts.
>
> Mr. Pleho had a six month inspection period within which to conduct his due diligence of the company before committing to purchase it. . . .

At the time Mr. Pleho assumed responsibility for the business:

> 1. All vehicles that were used for business purposes were fully operational and were inspected by state certified inspectors who issued Commercial Safety Inspection Certificates plus window stickers by the State of Hawai'i just prior to transfer;
>
> 2. Mr. Pleho was given an accurate profit and loss statement for the period that Mr. Rnic operated the business, and Mr. Rnic's actual profits for 2005 were higher than anticipated;
>
> 3. A list of clients was conveyed to Mr. Pleho which accurately reflected the history of services rendered during the time Mr. Rnic operated the business.
>
> All of the above information was provided to the buyer for the express purpose of allowing him to perform any and all reviews during his due diligence period.

The letter nevertheless included an offer to reduce the purchase price by $350,000 and take back possession of all RLS's vehicles.

On April 11, 2006, in an email to Lacy, Goran stated: "About the six months due diligence period, I didn't know, because if I did, I would have certainly pull [sic] out of this deal." On April 14, 2006, in a letter to Lacy, Goran stated:

> [Rnic's] letter claims that I had 6 months to change my mind, but I looked into the contract, and I can not [sic] find it, can you? Show me where it is, have you even red [sic] it? If it is there, and purchase date is March 10th 2006, then I have 6 months to back out of the deal.

Later that day, Goran again emailed Lacy: "[W]here is the 6 months I had to back up? It says in the contract that I have completed due diligence, but it does not say how long did I have." In response to this email, Lacy stated:

> [Y]ou trusted Dragan. I know he lied to you but the fact is that you had an opportunity to look at the vehicles and look at the books and you chose not to. That makes a lawsuit more difficult from your perspective because they will always, as they have now, come back to that unfortunate fact. The agreement specifically states (as I recall) that you have done due diligence. That means that it will be much harder to complain about the condition and value of vehicles because you had the opportunity to check their condition and their value.

Lacy discouraged Goran from litigating because Goran and Rnic would "both lose."

On April 17, 2006, Lacy sent a letter to Rnic's attorney stating:

> Mr. Pleho and Mr. Rnic applied for a transfer of the license as part of the sale, and Mr. Rnic never indicated to Mr. Pleho that he had an option to back out of their agreement before transfer of the PUC license. In fact, Mr. Pleho informs me that Mr. Rnic continually pressured him in this transaction.

The letter rejected Rnic's offer to reduce the purchase price by $350,000, and proposed that the parties either: (1) have RLS valued by an expert and revise the purchase price accordingly; (2) mediate the dispute; or (3) rescind the transaction and return both parties to their former positions.

On April 18 and 28, 2006, Rnic completed the sales of the remaining two Properties.

Sometime before May 11, 2006, Goran released Lacy, and the Pleho Parties retained new counsel.

B.    The Pleho Parties File Suit

On July 6, 2006, the Pleho Parties filed a Complaint against the Lacy Parties and Rnic, alleging fraud in the inducement, intentional infliction of emotional distress (**IIED**), unfair and deceptive trade practices under Hawaii Revised Statutes (**HRS**) Chapters 480 and 481A, legal malpractice as to the Lacy Parties only, and punitive damages. On August 21, 2008, the Pleho Parties filed a First Amended Complaint, to which they attached declarations of both Goran and Maria alleging physical and psychological injury.

10

On January 23, 2009, the Pleho Parties filed a Second Amended Complaint, which extended their existing claims (except legal malpractice) to all the defendants and included Goran and Maria as individual plaintiffs into every claim. The Second Amended Complaint included the following counts: conspiracy to commit fraud (Count I); fraud (Count II); fraud in the inducement (Count III); gross inadequacy of consideration (Count IV); IIED (Count V); negligent infliction of emotional distress (**NIED**) (Count VI); unfair and deceptive trade practices (Count VII); legal malpractice as to the Lacy Parties only (Count VIII); intentional spoliation of evidence (Count IX); negligent spoliation of evidence (Count X); and punitive damages (Count XI). The Second Amended Complaint alleged that the Pleho Parties would not have purchased RLS had Lacy or Rnic disclosed Lacy's prior representation of Rullo or the Rnic's prior potential sale of RLS to Rullo for $800,000. The Pleho Parties did not bring claims against Rnic for breach of contract.

C.    Rnic's Motion for Summary Judgment

On February 6, 2009, Rnic answered the Second Amended Complaint and filed a counterclaim against the Pleho Parties, as well as a claim against Anagor, LLC dba AM PM Taxi (**Anagor**) for, *inter alia*, breach of contract, breach of covenant of good faith and fair dealing, fraud and misrepresentation, unjust enrichment,

and conversion.[4] Rnic also cross-claimed against the Lacy Parties for legal malpractice and indemnification.

On March 27, 2009, Rnic moved for summary judgment against the Pleho Parties as to the Pleho Parties' claims. On April 21, 2009, the Circuit Court heard Rnic's motion and, on May 13, 2009, the Circuit Court entered an order granting summary judgment in favor of Rnic.

On May 22, 2009, the Pleho Parties filed a motion for reconsideration of the May 13, 2009 order granting Rnic's motion for summary judgment. On July 17, 2009, the Circuit Court entered an order denying the motion.

On November 12, 2010, after conducting additional discovery, the Pleho Parties filed a motion to set aside the May 13, 2009 order granting summary judgment for Rnic. The motion alleged that newly discovered evidence showed that Lacy conspired with Rnic to sell RLS to Goran at an inflated price and to defraud Goran and Maria into transferring the Properties to Rnic. In his declaration in support of this motion, Goran stated that both Lacy and Rnic had represented to him that RLS was worth $2 million, and that the business could not be appraised because it was such a unique business.

On December 2, 2010, the Circuit Court heard the Pleho Parties' November 12, 2010 motion to set aside. On February 14, 2011, the Circuit Court entered an order denying the motion.

---

[4] Rnic asserted that GPLLC was an alter ego, entity, trade name, or business name used by Goran, and that Anagor was the alter ego of GPLLC and/or Goran. It appears, however, that Anagor was not served, and thus was not a party.

On January 9, 2012, the Circuit Court entered a Judgment in favor of Rnic "on all claims asserted" by the Pleho Parties, pursuant to the May 13, 2009 order granting Rnic's motion for summary judgment.

D.   The Lacy Parties' Motion to Dismiss

On February 26, 2009, the Lacy Parties filed a Hawaiʻi Rules of Civil Procedure (**HRCP**) Rule 12(b)(6) motion to dismiss the January 23, 2009 Second Amended Complaint, to the extent that the Pleho Parties sought relief against the Lacy Parties.[5]   After an April 21, 2009 hearing, on May 13, 2009, the Circuit Court entered an order granting the Lacy Parties' motion.

On May 22, 2009, the Pleho Parties filed a motion for reconsideration and clarification of the May 13, 2009 order granting the Lacy Parties' motion.[6]   The motion argued that the Lacy Parties had failed to address the Pleho Parties' claims for Unfair and Deceptive Trade Practices (Count VII) and Punitive Damages (Count XI).   The Pleho Parties also argued that

> while the Lacy [Parties'] memorandum in support of their motion argued that [the Pleho Parties'] cause of action for legal malpractice "should be dismissed as to all parties because the claims are not factually supported and [the Pleho Parties] cannot establish they have any damages, . . .," the Lacy [Parties] failed to produce any evidence to support this argument.   On the other hand, [the Pleho Parties'] [Second Amended Complaint] clearly establishes the basis for the damages suffered by [the Pleho Parties].

On July 29, 2009, the Circuit Court entered an order "denying and clarifying" its May 13, 2009 order (**July 29, 2009**

---

[5]   Although the motion was captioned as a motion to dismiss the entire Complaint, the memorandum in support of the motion stated: "[s]pecifically, the Lacy [Parties] are requesting dismissal of Counts I, II, III, IV, V, VI, VIII, IX, and X[.]"

[6]   In the interim, on May 20, 2009, the Lacy Parties also answered the Second Amended Complaint.

**Order**), stating that it denied the motion "because [the Pleho Parties] ha[d] failed to allege new evidence or [evidence] that could not have been presented in their original motion."

The July 29, 2009 Order also stated that: claims for fraud (Count II), fraud in the inducement (Count III), legal malpractice (Count VIII), and punitive damages (Count XI) still stood as brought by GPLLC; and claims for unfair and deceptive trade practices (Count VII) and punitive damages (Count XI) still stood as brought by Goran and Maria, individually. The order further clarified the Circuit Court's dismissal of several counts:

> Count I for conspiracy to commit fraud falls away because there is but one person accused and the prior co-conspirator has been judged not liable. . . .
>
> Count V and VI are properly dismissed by implication. There is no mental distress which can be suffered by a corporation. . . .
>
> Count VII for unfair and deceptive trade practices can not [sic] stand on behalf of the LLC, because a claim for unfair and deceptive trade practices is reserved by statute for consumers. . . .
>
> Count VIII for legal malpractice was asked to be dismissed as to the Plehos as individual plaintiffs, because they had not suffered damages; they did not purchase, as individuals, the business that is the underlying subject of this case, and therefore did not suffer any individual damages relating to the purchase. The Court ruled in favor of the Defendants; therefore Count VIII for legal malpractice stands on behalf of the LLC alone.
>
> Count XI for punitive damages stands, based only on the claims still standing for the individual Plehos and the LLC. But because the only claim the individual Plehos can claim punitive damages for is unfair and deceptive trade practices, which awards double or treble damages, they should be held to only one form of recovery[.]

On November 12, 2010, after conducting further discovery, the Pleho Parties filed a motion to set aside portions of the July 29, 2009 Order. After a December 2, 2010 hearing, on

January 13, 2011, the Circuit Court entered an order denying the motion.

E.    The Lacy Parties' Motions for Partial Summary Judgment

On November 9, 2010, the Lacy Parties filed an HRCP Rule 56 motion for partial summary judgment on the Plehos' unfair and deceptive trade practices claim.  On February 23, 2011, the Circuit Court granted the motion.

On February 24, 2011, the Lacy Parties filed an HRCP Rule 56 motion for partial summary judgment on the Plehos' punitive damages claim.  On May 12, 2011, the Circuit Court granted the motion.

F.    Settlement Agreements

On March 10, 2011, counsel for the Pleho Parties, the Lacy Parties, and Rnic appeared before the Circuit Court to place two settlements on the record:  (1) an agreement between Rnic and the Lacy Parties, which had been signed by the parties on March 9, 2011 (the **Rnic/Lacy Parties Agreement**); and (2) an agreement between Rnic, Goran, and GPLLC (the **Rnic/Goran/GPLLC Agreement**). Goran participated by telephone.

Under the Rnic/Lacy Parties Agreement, the Lacy Parties' insurance company agreed to pay $650,000 to Rnic.  Rnic broadly agreed to release GPLLC, Anagor, and their respective members, from any and all claims relating to or arising out of the July 25, 2005 Sale Agreement and Promissory Note, which were or could have been made in Rnic's counterclaim or a third party complaint.  Rnic further agreed to dismiss his counterclaim against GPLLC and his cross-claim against Lacy with prejudice,

15

and not to file a third-party complaint. The Lacy Parties and Rnic would each pay their own attorneys' fees and costs.

Under the Rnic/Goran/GPLLC Agreement, Goran and GPLLC would dismiss all their claims against Rnic. In addition, "Goran Pleho [would] execute a settlement agreement which [would] contain a stipulation for an entry of judgment in the amount of $100,000 to be paid in twenty-five monthly installments of $4,000, no interest, beginning June 1, 2011." In return, Rnic agreed to: (1) dismiss with prejudice any and all claims against Goran, Maria, GPLLC, and Anagor; (2) refrain from filing or serving a third-party complaint against Anagor or any of its members; (3) disclose any and all of the terms of Rnic's settlement with the Lacy Parties; (4) withdraw all claims in bankruptcy against Goran or Maria; (5) remove any and all liens, if any, outstanding on the vehicles owned by GPLLC; (6) cease and desist from calling or going to the business premises of GPLLC and/or Anagor, and/or contacting any of its clientele or vendors.

Counsel for Rnic agreed to these terms after the Pleho Parties' counsel recited them, stating:

> That's correct, your Honor. And just to make it clear, that all claims that Anna Marie [sic] Pleho, Goran Pleho, Goran Pleho, LLC, or Anagor, LLC, would have against my clients are also being dismissed with prejudice. So it's a complete dismissal. There will be no appeal of this matter.

However, the Pleho Parties' counsel objected to the portion of the settlement referring to Anagor, insisting that Goran did not have the authority to settle on behalf of Anagor. He stated that his understanding was that Anagor was not a party to the settlement.

The Circuit Court sought clarification as to the scope of the Rnic/Lacy Parties settlement. After the attorneys clarified the scope, they concluded:

> [RNIC's COUNSEL]: . . . So with that being said, the terms placed on the record by [the Pleho Parties' counsel] would be sufficient.
>
> THE COURT: Mr. Rosdil, that clear enough?
>
> [PLEHO PARTIES' COUNSEL]: Clear enough. You know, it's what we agreed.

The Circuit Court then attempted to confirm the agreement with the Lacy Parties' counsel and with Goran, clarifying that the agreements did not bind Maria, although Rnic's claims against her would be dismissed:

> THE COURT: Okay. Now, on both settlements between the Rnic and the Lacy defendants as well as Mr. Rosdil's clients, any objection? If there's any dispute as to the terms of the settlement, that this Court is the final binding arbiter? No appeal?
>
> [RNIC's COUNSEL]: That's correct, your Honor.
>
> [PLEHO PARTIES' COUNSEL]: That's correct.
>
> [LACY PARTIES' COUNSEL]: Yes, your Honor.
>
> [PLEHO PARTIES' COUNSEL]: You want -- Mr. Pleho is --
>
> THE COURT: Oh, Mr. Pleho.
>
> MR. PLEHO: Yes.
>
> THE COURT: Did you hear the settlement represented?
>
> MR. PLEHO: Yes. Except that last thing.
>
> THE COURT: What's the last thing?
>
> MR. PLEHO. I'm not sure.
>
> THE COURT: About the Court maintaining --
>
> MR. PLEHO: There was something about Anagor, so I don't know what was . . .
>
> [PLEHO PARTIES' COUNSEL]: He's referring to Anagor.
>
> THE COURT: Okay. About Mr. Claggett's client not filing – withdrawing all claims against Anagor. Is that correct?
>
> [RNIC's COUNSEL]: That's correct, your Honor.
>
> THE COURT: Mr. Pleho, you heard that now?
>
> MR. PLEHO: Yes.
>
> THE COURT: You agree with that settlement in total as stated now?
>
> MR. PLEHO: Yes.
>
> THE COURT: Any questions?
>
> [RNIC's COUNSEL]: And he's --
>
> MR. PLEHO: No.
>
> [RNIC's COUNSEL]: -- just so that the record's clear, he's agreeing --

[PLEHO PARTIES' COUNSEL]: What did he say?
THE COURT: Do you have any questions?
MR. PLEHO: No. No.
[RNIC's COUNSEL]: He's agreeing on behalf of himself and Goran Pleho, LLC.
THE COURT: Mr. Pleho, you're agreeing on behalf of yourself and Goran Pleho, LLC?
MR. PLEHO: Yes.
[RNIC's COUNSEL]: And Mr. Rosdil can confirm that he has authority from Marie [sic] Pleho, or Anna Marie [sic] Pleho, that this settlement's --
[PLEHO PARTIES' COUNSEL]: Well, I don't have authority from Anna Marie [sic]. All of her claims, to my knowledge, have been dismissed. And as the individual, they've been dismissed as to your client.
[RNIC's COUNSEL]: We still need her to sign-off on the settlement agreement. That's my only concern. You still have contact with her?
[PLEHO PARTIES' COUNSEL]: I do. But as I've explained to you, she's like another person out there. I don't think there's any problem with her signing. But I don't have authority from her.
[RNIC's COUNSEL]: Your Honor, there's --
[PLEHO PARTIES' COUNSEL]: We didn't talk about her authority yesterday when we did this, you know.
[RNIC's COUNSEL]: Your Honor, if there's an issue, I'll just come to the court, and we can file a motion, if she doesn't want to settle.
THE COURT: Well, you understand she's not here today, so --
[RNIC's COUNSEL]: I understand.
THE COURT: And the only parties that are here today for the settlement is what [Pleho Parties' Counsel] represented and you and [Lacy Parties' Counsel]. Nonparties who are not part of this settlement, the Court will not bind them.

At that point, the court asked what claims were remaining for trial. The Lacy Parties' attorney stated that the plaintiffs' claims against the Lacy Parties were left. Rnic's attorney confirmed that he would not be participating in the Hawaii Rules of Evidence Rule 104 hearing.

G.     Rnic's Motion to Enforce Settlement

On July 7, 2011, Rnic filed a motion to enforce the Rnic/Goran/GPLLC Agreement. Rnic argued:

> [Goran] made clear that he was agreeing on behalf of himself and on behalf of [GPLLC], and as such, both are responsible for paying under the terms of the agreement. Moreover, it was clear that the intent of the parties was to have the $100,000.00 obligation paid by [GPLLC], and not [the Plehos] individually, as one of the terms of the settlement agreement was to withdraw all claims against [the Plehos] from the bankruptcy. Thus, the only logical [payor] left in the settlement agreement was [GPLLC].

The Pleho Parties opposed the motion, arguing that the settlement agreement placed on the record was an agreement to make an agreement, and there was no meeting of the minds on essential terms. The Pleho Parties also argued:

> Who would pay and who the stipulation for an entry of judgment would be against was never agreed to by the Parties, and therefore, no stipulation for an entry of judgment was signed by the Parties. There is no evidence that [GPLLC] was obligated to pay [Rnic] nor that failure to pay would result in a Judgment against [GPLLC].

On August 16, 2011, the parties' attorneys argued the scope of the oral settlement agreement before the Circuit Court. The Pleho Parties argued that there was no enforceable settlement agreement because Goran had not signed Rnic's proposed version, which allegedly reflected terms to which Goran had not agreed. Counsel for Rnic argued that the agreement put on the record was a binding contract as to GPLLC:

> And your Honor, I brought with me judgments that your Honor can sign, both -- I have two versions, depending on how your Honor rules, jointly against [Goran] individually and [GPLLC]. He was clearly agreeing to the terms in his capacity individually and as the managing member of [GPLLC], or I have one just as to [GPLLC], which would be -- quite frankly, either way is fine with my client.

The Circuit Court ruled:

> Okay. The Court's ruling is this: The settlement on the record stated that the Court is the final binding arbitrator if there's any dispute regarding settlement. At least the settlement contemplates the submission of written settlement documents.
> So [counsel for Rnic], if you have a settlement document that is in dispute, as far as the terms of the settlement, you submit it to the Court, and the Court will then determine the dispute in the settlement documents. And then you can go from there, whatever the Court finds, if any.

The Circuit Court declined to rule orally on the issue of whether GPLLC was bound by the settlement agreement. The Circuit Court stayed Rnic's motion to enforce the settlement and asked Rnic to file another proposed settlement agreement. The Circuit Court also stated that it would rule on the issue when it received the proposed settlement and the Pleho Parties' position.

On October 4, 2011, the Circuit Court conducted another status conference on the motion to enforce settlement, again taking the matter under advisement. Rnic argued that it would not make sense for Rnic to settle only with Goran individually rather than with GPLLC because Goran and Maria were in bankruptcy at the time, and thus "the only instrument for collection in the day would be [GPLLC], as a practical matter."

On November 14, 2011, the Circuit Court entered an order granting Rnic's July 7, 2011 motion to enforce settlement. The Circuit Court found that "Goran Pleho agreed to bind both himself and [GPLLC], as reflected on page 14 line 3 of the *Transcript of Proceedings*, dated March 10, 2011."

H.    The Lacy Parties' Motion for JMOL

GPLLC's remaining claims against the Lacy Parties proceeded to a jury trial in June of 2011. On June 22, 2011, after the plaintiff rested its case, the Lacy Parties moved for judgment as a matter of law (**JMOL**) under HRCP Rule 50(a), challenging GPLLC's remaining claims for legal malpractice, fraud, fraud in the inducement, and punitive damages. The Circuit Court orally denied the motion as to the legal malpractice claim but granted the motion as to the fraud, fraud

in the inducement, and punitive damages claims. On July 7, 2011, the Circuit Court entered a written order pursuant to its oral ruling on the issue.

I.    The Trial on GPLLC's Malpractice Claims

The Pleho Parties all alleged that Lacy had committed legal malpractice in his representation of them. However, because Goran and Maria's claims were dismissed by the July 29, 2009 Order, only GPLLC's legal malpractice claims went to trial. After the three-week trial, only GPLLC's Count VIII (legal malpractice) against the Lacy Parties was submitted to the jury, which returned a Special Verdict (**Jury Verdict**) on June 29, 2011, finding that while Lacy breached the applicable standard of care in providing legal services to GPLLC, Lacy's breach was not a legal cause of GPLLC's damages. Thus, the jury did not find the Lacy Parties liable for legal malpractice. The Pleho Parties did not appeal the Jury Verdict.

J.    The Judgment

On January 9, 2012, the Circuit Court entered a Judgment that: (1) entered judgment in favor of the Lacy Parties on all claims asserted by Goran and Ana Maria, pursuant to (a) the May 13, 2009 order granting the Lacy Parties' motion to dismiss, (b) the July 29, 2009 order denying and clarifying the Pleho Parties' motion for reconsideration, (c) the February 23, 2011 order granting Lacy Parties' motion for partial summary judgment as to unfair and deceptive trade practices claims, and (d) the May 12, 2011 order granting Lacy Parties' motion for partial summary judgment as to punitive damages; (2) entered

21

judgment in favor of the Lacy Parties on all claims asserted by GPLLC pursuant to (a) the May 13, 2009 order granting the Lacy Parties' motion to dismiss, (b) the July 29, 2009 order denying and clarifying the Pleho Parties' motion for reconsideration, (c) the July 7, 2011 order granting in part and denying in part the Lacy Parties' motion for JMOL, and (d) the June 29, 2011 Special Verdict; (3) entered judgment in favor of Rnic on all claims asserted by the Pleho Parties pursuant to the May 13, 2009 order granting Rnic's motion for summary judgment; (4) entered judgment in favor of Rnic against Goran and GPLLC, jointly and severally, for $100,000 pursuant to the November 14, 2011 order granting Rnic's motion to enforce settlement; (5) declared that "[a]ll other claims, counterclaims, and cross-claims are hereby dismissed;" and (6) declared that the issue of attorneys' fees and costs in favor of the prevailing parties would be determined by the Court at a later date.

    K.   Attorneys' Fees and Costs

On September 9, 2011, the Lacy Parties filed a motion for an award of attorneys' fees and costs, pursuant to the Circuit Court's May 13, 2009 order granting the Lacy Parties' February 26, 2009 motion to dismiss in part the Second Amended Complaint and the June 29, 2011 Special Verdict finding no legal malpractice.

On October 20, 2011, the Circuit Court entered an order denying the Lacy Parties' motion. The Circuit Court based its denial on the fact that there was a written contract, dated August 9, 2005 (the Engagement Letter), which did not provide for

attorneys' fees, and thus the assumpsit provision in HRS § 607-14 did not apply.

On October 27, 2011, the Lacy Parties filed a motion for reconsideration, which the Pleho Parties opposed. On December 6, 2011, the Circuit Court heard the Lacy Parties' motion for reconsideration. The Circuit Court reversed its earlier ruling that the case did not warrant attorney's fees under the assumpsit provision in HRS § 607-14 (1993), and noted that the dispute at that point was not whether the prevailing party was entitled to attorney's fees and costs, but rather who was the prevailing party.

On January 9, 2012, the Circuit Court entered an order granting the Lacy Parties' motion for reconsideration and awarding attorneys' fees of $407,013.69 and costs of $29,919.96 to the Lacy Parties.

L.    Facts related to Evidentiary Issues

On June 9, 2009, the Plehos filed a joint Chapter 11 Voluntary Petition for Bankruptcy Protection in the U.S. Bankruptcy Court for the District of Nevada. Under "Schedule B - Personal Property," they did not identify any debts payable to themselves from GPLLC.

On June 19, 2009, the Plehos notified the Circuit Court of the Plehos' Chapter 11 bankruptcy filing. On July 30, 2009, the Circuit Court recognized an automatic stay of the pending action pursuant to the Plehos' bankruptcy petition. On July 8, 2010, the Bankruptcy Court granted the Plehos' motion for relief from the stay to allow all parties to proceed in this action.

On April 21, 2011, the Lacy Parties filed a motion *in limine* to bar the Pleho Parties from pursuing claims for, or introducing any evidence regarding, any alleged loan, debt, note, payment, advance, contract, or other asset not specifically declared as an asset in the Plehos' Nevada bankruptcy court action (**Motion in Limine No. 2**). On June 3, 2011, the Circuit Court heard and orally denied the motion, stating, "the motion is denied. Certainly it goes to credibility versus admissibility." On July 8, 2011, the Circuit Court entered an order denying the motion.

During trial on June 21, 2011, counsel for the Pleho Parties attempted to offer into evidence a check from Goran to GPLLC in order to prove damages. Counsel for the Lacy Parties objected based on a lack of relevance and foundation. The Circuit Court received the exhibit into evidence.

Counsel for the Lacy Parties noted that the document showed only the deposit of cash into GPLLC's account, and not the existence of a debt owed by GPLLC to Goran. Additionally, he noted that there was no evidence that the principal was ever repaid or that GPLLC paid any interest to Goran. Goran testified that it was his understanding that he would be repaid for his advance to GPLLC.

M.   Appeal and Cross-Appeal

On January 12, 2012, the Pleho Parties filed a timely notice of appeal from the January 9, 2012 Judgment.

On January 26, 2012, the Lacy Parties filed a timely notice of cross-appeal from the July 8, 2011 order denying the Lacy Parties' April 21, 2011 Motion in Limine No. 2.

II.  POINTS OF ERROR ON APPEAL

The Pleho Parties raise the following points of error:[7]

(1)  The Circuit Court erred when it granted Rnic's motion to enforce settlement;

(2)  The Circuit Court erred when it granted Rnic's motion for summary judgment;

(3)  The Circuit Court erred when it granted the Lacy Parties' motion to dismiss the Pleho Parties' claims for conspiracy, inadequate consideration, IIED, NIED, and spoliation of evidence, and the Plehos' claims for fraud, fraud in the inducement, and malpractice;

(4)  The Circuit Court erred when it granted the Lacy Parties' motions for partial summary judgment as to the Plehos' deceptive trade practices and punitive damages claims;

(5)  The Circuit Court erred when it granted the Lacy Parties' motion for JMOL as to GPLLC's claims for fraud, fraud in the inducement, and punitive damages; and

(6)  The Circuit Court erred when it granted the Lacy Parties' motion for reconsideration as to attorneys' fees and costs, found that malpractice sounds in assumpsit, and granted the Lacy Parties' fees and costs as the prevailing party;

---

[7]     Appellants' points of error have been reorganized for clarity.

The Lacy Parties raise the following points of error:

(1)  The Circuit Court abused its discretion when it denied the Lacy Parties' Motion in Limine No. 2 because the court should have applied judicial estoppel to bar evidence of money and property GPLLC claimed to have borrowed from the Plehos because the Plehos failed to disclose any such loans to GPLLC in their bankruptcy schedules; and

(2)  The Circuit Court erred as a matter of law by admitting evidence at trial of a payment made by Goran to GPLLC when Goran did not disclose any such debt owed to him in the bankruptcy schedules because the contested evidence was irrelevant, not evidence of a debt, and not a proper item of damages.

III.  APPLICABLE STANDARDS OF REVIEW

As the Hawai'i Supreme Court has held:

> A circuit court's ruling on a motion to dismiss is reviewed de novo.  It is well-established that [a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief.  [The appellate court] must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory.  For this reason, in reviewing [a] circuit court's order dismissing [a] complaint . . . [the appellate court's] consideration is strictly limited to the allegations of the complaint, and [the appellate court] must deem those allegations to be true.

Kealoha v. Machado, 131 Hawai'i 62, 74, 315 P.3d 213, 225 (2013) (brackets and ellipsis in original, internal citations omitted, format altered).

> A motion for summary judgment is reviewed de novo, under the same standard applied by the trial court.  Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

> entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting an essential element of a cause of action asserted by one of the parties.
>
> On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. The burden lies upon the moving party to show that no genuine issue of material fact exists with respect to the essential elements of the claim and that, based on the undisputed facts, he is entitled to judgment as a matter of law. Only once the moving party has satisfied its initial burden of production does the burden shift to the non-moving party to show specific facts that present a genuine issue for trial.

Gurrobat v. HTH Corp., 133 Hawai'i 1, 14, 323 P.3d 792, 805 (2014) (internal citations and quotation marks omitted).

> It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*. When [the appellate court reviews] the granting of a [motion for judgment as a matter of law], we apply the same standard as the trial court.

Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-15 (2004) (some brackets in original and some added, internal citations and footnote omitted, format altered).

> A motion for JMOL may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Lahaina Fashions, Inc. v. Bank of Haw., 131 Hawai'i 437, 453, 319 P.3d 356, 372 (2014) (citation and internal quotation marks omitted).

"Whether the parties in fact entered into an agreement is essentially a question of fact." Assocs. Fin. Servs. Co. of Haw., Inc. v. Mijo, 87 Hawai'i 19, 28, 950 P.2d 1219, 1228 (1998) (citation omitted). We review a trial court's findings of fact under the clearly erroneous standard. Id.

"A trial court's determination regarding the enforceability of a settlement agreement is a conclusion of law reviewable *de novo*." Id. (citation omitted).

> A motion to enforce a disputed settlement agreement is treated as a motion for summary judgment. Miller v. Manuel, 9 Haw. App. 56, 64, 828 P.2d 286, 292 (1991), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1992). A motion for summary judgment should not be granted where there is a factual question as to the existence, validity, and terms of the alleged settlement agreement, and where such a dispute exists, a trial or an evidentiary hearing to resolve the dispute is required.

Gilmartin v. Abastillas, 10 Haw. App. 283, 296, 869 P.2d 1346, 1352 (1994).

> [S]ummary judgment standards appl[y] to a hearing on a motion to enforce a settlement agreement. Therefore, a motion to enforce a settlement agreement may not be decided summarily if there is any question of fact as to whether a mutual, valid, and enforceable settlement agreement exists between the parties. If there is a question of fact as to the existence of a mutual, valid, and enforceable settlement agreement, an evidentiary hearing must be held.

Moran v. Guerreiro, 97 Hawaiʻi 354, 371, 37 P.3d 603, 620 (App. 2001) (citing Miller v. Manuel, 9 Haw. App. at 64, 828 P.2d at 292).

> [An appellate] court reviews a lower court's award of attorneys' fees for abuse of discretion. The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. In other words, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

Hart v. Ticor Title Ins. Co., 126 Hawaiʻi 448, 455, 272 P.3d 1215, 1222 (2012) (brackets, internal citations, and quotation marks omitted).

IV. DISCUSSION

   A.   Rnic's Motion to Enforce Settlement

        The Pleho Parties argue that there was never a meeting of the minds as to settlement, that Goran never intended for

GPLLC to be bound to pay the resulting judgment, and that the Pleho Parties did not, as Rnic argued, waive their right to appeal the Circuit Court's ruling or the judgment.

We first consider whether a valid settlement agreement was formed. In Dowsett v. Cashman, 2 Haw. App. 77, 83, 625 P.2d 1064, 1068 (1981), the Intermediate Court of Appeals (**ICA**) held that a binding compromise agreement had been formed when the parties, "in open court, entered into what appears to be a voluntary, well-thought-out, and previously discussed agreement to settle their dispute." The ICA explained:

> Where the parties have voluntarily entered into a stipulation which appears fair and reasonable for the compromise and settlement of the issues of a pending cause and where the stipulation is spread upon the record with the consent and approval of the court, as here, the parties are bound thereby and the court may, thereafter, properly proceed to dispose of the case on the basis of the pleadings, the stipulations and the admitted facts.

Id. at 83, 625 P.2d at 1068 (quotation marks omitted) (quoting Goltl v. Cummings, 380 P.2d 556, 559 (Colo. 1963)).

Here, the parties to the Rnic/Goran/GPLLC Agreement clearly intended to end the litigation and agreed to dismiss all of their claims against each other. Prior to the hearing, counsel for both parties had discussed the terms at length. In his declaration in support of Rnic's motion to enforce settlement, Rnic's counsel stated:

> [D]uring the negotiations my client originally wanted the payments to be $5,000.00 per month for 20 months, however, Will Rosdil on behalf of Goran Pleho and [GPLLC] stated that [GPLLC] could not afford the payments of $5,000.00 per month and still operate, but that it could afford $4,000.00 per month. As a result of the statements and request of Will Rosdil, [Rnic] agreed to the $4,000.00 per month payment for 25 months.

At the beginning of the hearing at which the settlement was placed on the record, counsel for the parties stated that they had reached an agreement and were ready to place the terms on the record:

> [RNIC'S COUNSEL]: [Pleho Parties' counsel] and I have entered into a settlement agreement, and [Pleho Parties' counsel] has the terms that we'd like to put on the record. And we just -- the reason why we have Mr. Pleho on the phone is just to make sure he's canvassed and he understands the terms and agrees to them.
>
> THE COURT: Okay.
>
> [PLEHO PARTIES' COUNSEL]: Our arrangement is it's subject to his agreement with [Counsel for the Lacy Parties]. So if you can just put your agreement with [Lacy Parties' counsel] on the record, please.

After the terms of the Rnic/Lacy Parties Agreement were placed on the record, the Pleho Parties' counsel orally stated the terms of the Rnic/Goran/GPLLC Agreement between Rnic and his clients, and Goran indicated that he had heard and agreed to all the terms. No essential terms were left to be determined at a later date. Thus, the Circuit Court did not clearly err in determining that a binding settlement agreement was formed at the March 10, 2011 hearing.

Next we turn to the question of whether GPLLC is jointly liable under the Rnic/Goran/GPLLC Agreement for the $100,000 in payments to Rnic. The Circuit Court concluded that "Goran Pleho agreed to bind both himself and [GPLLC] as reflected on page 14 line 3 of the *Transcript of Proceedings*, dated March 10, 2011." We agree. The transcript of proceedings clearly indicates that Goran agreed to the terms both individually and in his capacity as a member of GPLLC, including:

```
THE COURT:          Do you have any questions?
MR. PLEHO:          No.  No.
[RNIC's COUNSEL]:   He's agreeing on behalf of himself and
                    Goran Pleho, LLC.
THE COURT:          Mr. Pleho, you're agreeing on behalf of
                    yourself and Goran Pleho, LLC?
MR. PLEHO:          Yes.
```

Moreover, the terms of settlement benefitted GPLLC in that Rnic agreed to dismiss his breach of contract claims against GPLLC, remove any and all liens outstanding on vehicles owned by GPLLC, and cease and desist from contacting any of GPLLC's vendors or clients.  GPLLC was the party owing the payments to Rnic under the terms of the Sale Agreement and Promissory Note and the Plehos were seeking relief from their debts in bankruptcy court.  In addition, it appears from the record that the settlement payment amount was negotiated at least in part based on what GPLLC could afford to pay while still maintaining its ongoing operations.  Thus, the record supports the Circuit Court's conclusion that the parties agreed that both Goran and GPLLC were obligated to make the settlement payments; there is no support in record, other than Goran's subsequent denial, for the Pleho Parties' position that Goran did not intend to bind GPLLC to the payment term.  Thus, we conclude that the Circuit Court did not err in determining that the settlement agreement bound both Goran and GPLLC with respect to the monthly payments due to Rnic, which totaled $100,000.

Finally, the Pleho Parties argue that this court should reject Rnic's contention that Goran and GPLLC waived their right to appeal from the Circuit Court's ruling on Rnic's motion to enforce settlement.  We agree.  The Circuit Court *sua sponte* suggested that the Circuit Court be "the final binding arbiter."

Although the attorneys responded affirmatively, there is no evidence in the record that Goran and GPLLC had agreed to waive their right to appeal, and their counsel lacked the authority to bind them without such waiver.  See, e.g., Bach v. Stogdell, No. 28652, 2009 WL 522715, at *7 (Haw. App. Feb. 27, 2009) (quoting First Trust Co. of Hilo v. Cabrinha, 24 Haw. 777, 785 (Haw. Terr. 1919)) ("'To constitute a waiver otherwise than by express agreement there must be unequivocal acts or conduct of the vendor evincing the intent to waive.  Nothing short of this will amount to a waiver.'").  Neither of the proposed settlement agreements contemplated waiver of the right to appeal.  Rather, it appears undisputed that the Rnic/Goran/GPLLC Agreement, for example, contemplated good faith mediation prior to further litigation, as an uncontested part of the draft settlement agreement provided:

> In the event that a dispute between the parties hereto arises out of this Settlement Agreement, and/or the attached Stipulation of Entry of Judgment, . . . [t]he parties agree that they shall attempt in good faith to mediate the dispute before Denise Madigan, or another mediator mutually agreeable to the parties before commencing any litigation or arbitration.

Accordingly, we cannot conclude that there was an enforceable waiver of the Pleho Parties' right to seek relief from the Circuit Court's ruling on the settlement agreement.

B.    Summary Judgment for Rnic on Pleho Parties' Claims

As set forth above, the Circuit Court considered Rnic's request for summary judgment with respect to the Pleho Parties' claims against him three times:  first, in conjunction with Rnic's March 27, 2009 motion; second, in conjunction with the Pleho Parties' May 22, 2009 motion for reconsideration; and third, in conjunction with the Pleho Parties' November 12, 2010

motion to set aside. On appeal, the Pleho Parties contend that the Circuit Court erred when it granted summary judgment in favor of Rnic on their claims for conspiracy to commit fraud (Count I), inadequate consideration (Count IV), IIED (Count V), NIED (Count VI), unfair and deceptive trade practices (Count VII), spoliation (Counts IX and X), punitive damages (Count XI), and with respect to Goran and Maria only, the claims for fraud (Count II) and fraud in the inducement (Count III). However, as we have concluded that an enforceable settlement agreement existed between Goran, GPLLC, and Rnic, we need only consider the Circuit Court's granting of summary judgment on Maria's claims against Rnic.

## 1.    Conspiracy to Commit Fraud

> The Hawai'i Supreme Court has defined civil conspiracy as the combination of two or more persons or entities by concerted action to accomplish **a criminal or unlawful purpose,** or to accomplish some purpose not in itself criminal or unlawful **by criminal or unlawful means.** The supreme court explained that [c]ivil conspiracy does not alone constitute a claim for relief. In other words, concerted action is not enough. A civil conspiracy claim must include either that the alleged conspirators had a **criminal or unlawful purpose** for their concerted action or that the alleged conspirators used **criminal or unlawful means** to accomplish a lawful objective.

Miyashiro v. Roehrig, Roehrig, Wilson & Hara, 122 Hawai'i 461, 482, 228 P.3d 341, 362 (App. 2010) (emphases in original, internal citations and quotation marks omitted); see also Adams v. Dole Food Co., 132 Hawai'i 478, 490, 323 P.3d 122, 134 (App. 2014) ("there can be no civil claim based upon a conspiracy alone") (quoting Ellis v. Crockett, 51 Haw. 45, 57, 451 P.2d 814, 822 (1969)).

The Second Amended Complaint alleged that both Rnic and Lacy failed to disclose the extent of Lacy's involvement in the

33

Rnic/Rullo negotiations and that Rullo's proposed purchase price was only $800,000. It was undisputed that neither Rnic nor Lacy mentioned the Rnic/Rullo negotiations to the Plehos. The Second Amended Complaint also alleged that Rnic and Lacy had misrepresented to Goran "that the fair market value of RLS was $2.0 million, and that because it was such a unique business no appraisal was possible, and that $1.5 million was a fair price, and Plaintiff GORAN PLEHO relied on same."

However, as Rnic argued in his motion for summary judgment, the plaintiffs failed to allege or provide any evidence that Lacy acted in concert with Rnic to fraudulently induce them, i.e., intentionally participated with Rnic in the transaction to further a common design and purpose. "[M]ere acquiescence or knowledge is insufficient to constitute a conspiracy, absent approval, cooperation, or agreement." Tour2000 Co. v. Koreana Tour Serv., Inc., No. 28209, 2009 WL 3437431, at *9 (Haw. App. Oct. 23, 2009) (mem.) (quoting Robert's Haw. Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawaiʻi 224, 260 n.44, 982 P.2d 853, 889 n.44 (1999)); see also Zimmerman v. Grolle, 38 Haw. 217, 226 (Haw. Terr. 1948) ("The mere knowledge, acquiescence, or approval of the act, without co-operation or agreement to co-operate, is not enough to constitute one a party to a conspiracy. There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose.") (footnote and citation omitted). At no point in the Circuit Court's consideration of the summary judgment in favor of Rnic, including

on the motion for reconsideration and the motion to set aside, was such evidence brought before the court.

Thus, we conclude that the Circuit Court did not err in granting summary judgment as to Maria's claim of conspiracy in Count I.

2.    Fraud and Fraud in the Inducement

While the Second Amended Complaint lists separate counts for "Fraud" and "Fraud in the Inducement," fraud in the inducement is simply a type of fraud which induces an action or transaction by fraudulent misrepresentation. See, e.g., Aames Funding Corp. v. Mores, 107 Hawai'i 95, 103-04, 110 P.3d 1042, 1050-51 (2005) (also defining fraud in the factum and constructive fraud). Accordingly, we address Counts II and III together.

> The elements of fraud are:  (1) false representations made by the defendant; (2) with knowledge of their falsity (or without knowledge of their truth or falsity); (3) in contemplation of plaintiff's reliance upon them; and (4) plaintiff's detrimental reliance.

Miyashiro, 122 Hawai'i at 482-83, 228 P.3d at 362-63 (citation omitted).

> [T]o constitute fraudulent inducement sufficient to invalidate the terms of a contract, there must be (1) a representation of a material fact, (2) made for the purpose of inducing the other party to act, (3) known to be false but *reasonably* believed true by the other party, and (4) upon which the other party relies and acts to his or her damage.

Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i 277, 285 n.6, 172 P.3d 1021, 1029 n.6 (2007) (citation omitted). "The false representation, to be actionable, must relate to a past or existing material fact, and not to the happening of future events[.]" Haw. Cmty. Fed. Credit Union v.

Keka, 94 Hawai'i 213, 230, 11 P.3d 1, 18 (2000) (citation omitted). "An express averment of intent (to defraud) is not required, but it is sufficient if the existence of the intent can be clearly inferred from the allegations." Notley v. Notley, 23 Haw. 724, 737 (Haw. Terr. 1917) (citation omitted). In Matsuura v. E.I. du Pont de Nemours & Co., 102 Hawai'i 149, 163, 73 P.3d 687, 701 (2003), the supreme court clarified that "under Hawai'i law, to prevail on a claim of fraudulent inducement, plaintiffs must prove that their reliance upon a defendant's representations was reasonable." The court further stated that "[a]s a general principle the question of whether one has acted reasonably under the circumstances is for the trier of fact to determine. Additionally, this court has acknowledged the accepted principle that, where reasonable minds might differ as to the reasonableness of plaintiff's conduct, the question is for the jury." Id. (citations, internal quotation marks, ellipses, and brackets omitted).

In his motion for summary judgment, Rnic argued that Maria did not have standing to sue for fraud because she was not a party to the Sale Agreement or Promissory Note. Rnic further argued that he was entitled to summary judgment because Maria failed to show that she had detrimentally relied on representations made by Rnic to her regarding the business. Although we conclude that Maria had standing, we agree with Rnic's latter contention.

The Sale Agreement provided that "Goran Pleho, principal of [GPLLC]" would transfer the Properties to Rnic as

part of the sale price. However, Maria testified during her deposition that she had jointly owned the Properties with Goran. Additionally, the Residential Purchase Agreement, which Rnic and the Plehos executed on August 4, 2005 to transfer the Properties, lists both Goran and Maria as the "Sellers." Accordingly, the Pleho Parties offered evidence that Maria transferred her interest in the Properties, as part of the consideration for the purchase of RLS. Thus, Maria brought forward sufficient evidence to avoid summary judgment for a lack of standing.

Rnic also argued in his motion for summary judgment that Maria failed to specify any misrepresentations that Rnic made to her regarding RLS. The Pleho Parties offered the deposition testimony of Naylene Pacatang (**Pacatang**), who had previously worked under Rnic as an "administrative assistant, accountant and dispatcher" for RLS. Pacatang testified that Rnic had instructed her to alter profit and loss reports for January, February, and March of 2005 by changing certain expenses to "zero" in order to show "a profit of between $40,000 and $50,000 per month." However, Pacatang could not confirm that Rnic ever showed the altered financial statements to any potential buyer. Goran testified during his deposition that Rnic gave him profit and loss statements during his second visit, and the Pleho Parties produced "Profit and Loss" statements for February to June 2005 in response to Rnic's first request for production of "[a]ny and all 'documents and other things' which enticed [the Pleho Parties] to seek to manage and/or purchase the 'subject business.'" These statements show monthly net incomes ranging

from $35,305.53 to $90,467.35.  Rnic denied instructing Pacatang to change numbers on the profit and loss sheets.  However, he admitted that the statements contained "very, very incomplete numbers" that were "[n]ot at all" reliable because

> it would take months before I can be clear on any of these months.  The only reliable thing was at the end of the year, when I had all the bank statements, what I reported to federal taxes, state taxes, and all the other things that I had.

The Pleho Parties also presented in their interrogatory responses a detailed list of problems with RLS's vehicles, about which they allege Rnic failed to inform them.  The responses also included a list of statements that Rnic allegedly made about RLS.  While it appears that the Pleho Parties brought forward evidence creating a genuine issue of material fact as to whether Rnic made false representations to the Plehos about RLS, that is only one of the elements that must ultimately be satisfied.

With respect to Maria in particular, there is a dearth of evidence that she relied on Rnic's representations, as opposed to relying on her husband's desire to proceed with the transaction.  During her deposition, Maria testified that she and Rnic "didn't have many conversations."  During the one conversation she remembered having with Rnic, Rnic dictated some terms of the deal to her and she wrote them down.  She further testified that, while she had been present on several occasions when Rnic and Goran discussed the business, she could not recall any of the substance of these conversations because Rnic and Goran were speaking in Serbian, which she did not understand.

When asked if Rnic ever told her that RLS made a certain amount of money, or spoke to her about the client list or the conditions of the vehicles, Maria replied "No" or "No[,] I don't think so." She also answered affirmatively when asked, "prior to July 25th, 2005, [Rnic] didn't make any representations to you as to the substance of the business, correct?" Later in the deposition, she mentioned that Rnic had said some things about RLS to both her and Goran, such as that the cars were in good condition, that income was great, and that RLS was a unique business.

However, Maria could not remember whether Goran had showed her any of the documents that he received from Rnic, and answered "No" when asked if Goran ever showed her a client list, financials, or tax returns. Most significantly, when asked, "So your decision to give up your equity in those three homes was not based on anything that Mr. Rnic had said or given to you, correct?", she answered, "Correct."

Even viewing the evidence in the light most favorable to Maria, the evidence was insufficient to create a genuine issue of material fact as to Maria's reliance on Rnic's representations about RLS. Thus, the Circuit Court did not err in granting summary judgment to Rnic on Maria's claim of fraud or fraud in the inducement.

3.    Gross Inadequacy of Consideration

In his motion for summary judgment, Rnic argued that gross inadequacy of consideration is not a separate and distinct cause of action recognized by Hawai'i law.  The Pleho Parties cite several cases in support of their argument that gross inadequacy of consideration constitutes a separate cause of action, relevant portions of which state the following:

> Mere inadequacy of consideration is insufficient to set a bargain aside.  "If a person of ordinary understanding, on whom no fraud has been practiced, makes an imprudent bargain, no court of justice can release him from it. Inadequacy of consideration is not a substantial ground for setting aside a conveyance of property."

Harbottle v. Rawlins, 11 Haw. 105, 109 (Haw. Rep. 1897) (emphasis added) (quoting 1 Story's Eq. Juris., Sec. 237).

> A sale [of land], moreover, can not be set aside for mere inadequacy of consideration; it is only where the price paid is so grossly inadequate as to shock the conscience and raise a strong presumption of fraud, that equity will relieve, the ground of relief being, not the inadequacy, but the fraud evidenced thereby.

Berger v. Booth, 13 Haw. 291, 295-96 (Haw. Terr. 1912) (emphases added).

> Story, in his Equity Jurisprudence, Section 246, says:  "There may be such an unconscionableness or inadequacy in a bargain as to demonstrate some gross imposition, or some undue influence, and, in such cases, Courts of Equity ought to interfere upon the satisfactory ground of fraud.  But then such unconscionableness or such inadequacy should be made out as would (to use an expressive phrase) shock the conscience, and amount in itself to conclusive and decisive evidence of fraud."

Kailaa v. Kaaukai, 7 Haw. 653, 658 (Haw. Kingdom 1889) (emphases added) (quoting 1 Story's Eq. Juris., Sec. 246).

These cases, however, establish that gross inadequacy of consideration may evidence fraud, rather than establish a separate cause of action based on inadequacy of consideration. Thus, we conclude that the Circuit Court did not err in granting

summary judgment as to Maria's gross inadequacy of consideration claim in Count IV.

4.    IIED and NIED

As this court has previously explained:

> Our courts have adopted the Restatement (Second) of Torts' approach to IIED claims. [Hac v. Univ. of Haw., 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003)]. The elements of an IIED claim are: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another." Id. "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance[.]" [Ross v. Stouffer Hotel Co. (Haw.) Ltd., 76 Hawai'i 454, 465, 879 P.2d 1037, 1048 (1994)]. Restatement (Second) of Torts § 46 cmt. d (1965) characterizes outrageous conduct as follows:

>> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Simmons v. Aqua Hotels & Resorts, Inc., 130 Hawai'i 325, 332, 310 P.3d 1026, 1033 (App. 2013); see also Young v. Allstate Ins. Co., 119 Hawai'i 403, 429, 198 P.3d 666, 692 (2008) ("The term outrageous has been construed to mean without just cause or excuse and beyond all bounds of decency. The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable people may differ on that question it should be left to the jury.") (citations and internal quotation marks omitted).

> Also, "extreme emotional distress" constitutes, among other things, mental suffering, mental anguish, nervous shock, and other "highly unpleasant mental reactions." Enoka v. AIG Haw. Ins. Co., Inc., 109 Hawai'i 537, 559, 128 P.3d 850, 872 (2006) (citations and some internal quotation marks omitted). "[M]ental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the

> circumstances of the case." <u>Shoppe v. Gucci Am., Inc.</u>, 94
> Hawai'i 368, 387, 14 P.3d 1049, 1068 (2000) (quoting
> <u>Rodriques v. State</u>, 52 Haw. 156, 173, 472 P.2d 509, 520
> (1970)).

<u>Id.</u> at 429 n.26, 198 P.3d at 692 n.26.

Even assuming, *arguendo*, that all of the Pleho Parties' allegations are true, reasonable people could not construe Rnic's conduct in this commercial transaction as "beyond all possible bounds of decency." Furthermore, while Maria provided a declaration describing various psychological and physical injuries, including depression, heartburn, hair loss and acne, she failed to allege that Rnic's conduct in selling RLS to GPLLC for $1.5 million caused her emotional distress. Rather, her declaration made clear that her injuries were the result of the Plehos' attempts to run RLS after GPLLC had purchased it. Thus, we conclude that the Circuit Court did not err in granting summary judgment as to Maria's IIED claim in Count V.

In his motion for summary judgment, Rnic argued that the Pleho Parties had failed to show the elements of NIED because they had not established any injury to property or to themselves. We disagree to the extent that Maria alleged that she had personally suffered from, *inter alia*, bad acne and hair loss due to her stress. However, Maria failed to show that Rnic's conduct caused her injuries. Rather, the physical and psychological injuries detailed in Maria's declaration and testimony occurred, by Maria's own account, as a result of the Plehos' attempts to run RLS during the due diligence period and prior to the closing date in March 2006. These injuries were attributable to the foreseeable stress of buying and attempting to run a business

with which the buyer is completely unfamiliar.  Finally, the Pleho Parties do not cite to any Hawai'i case law supporting recovery for NIED based entirely on a commercial transaction, and we find none.  Thus, we conclude summary judgment was appropriate as to Maria's NIED claim in Count VI.

        5.    Unfair and Deceptive Trade Practices

        With respect to Maria's Unfair and Deceptive Trade Practices claim, the Pleho Parties argue on appeal:

> While HRS Section 480-1 limits recovery to consumers, stockholders of companies injured by deceptive trade practices have an independent action if they can show injury distinct from that suffered by their company.  Joy McElroy MD v. Maryl Group, 107 Hawai'i 423, 434-435, 114 P.33d [sic] 929 (App. 2005). . . . Goran and Maria conveyed $378,000 worth of property to Rnic and were forced to invest $300,000 of their own funds into RLS as a result of his deceptive trade practices.

(Format altered.)

        The Pleho Parties do not allege that they purchased, attempted to purchase, or were solicited to purchase goods or services.  Thus, we look to whether Maria's contribution of personal assets toward GPLLC's purchase of RLS can be considered a personal investment under the definition of "consumer" provided by HRS § 480-1 (2008).

        In Cieri v. Leticia Query Realty, Inc., 80 Hawai'i 54, 69, 905 P.2d 29, 44 (1995), the supreme court held that "real estate or residences qualify as 'personal investments' pursuant to HRS § 480-1[,]" and thus a couple who had purchased a home through a real estate broker had standing to sue under HRS § 480-2.  However, in Joy A. McElroy, M.D., Inc., 107 Hawai'i at 435-36, 114 P.3d at 931-42, this court considered whether "personal investments" included the contribution of personal funds for the

construction of improvements to commercial premises leased to a corporate tenant. In that case, an officer of a corporation executed a lease agreement on behalf of the corporation, and, along with another officer, signed a personal guaranty for the lease. Id. at 427, 114 P.3d at 933. The officers individually brought claims against the lessor under HRS Chapter 480, claiming that they had made "personal investments" using their own funds to improve the leased premises in reliance on the lessor's misrepresentations. Id. at 434, 114 P.3d at 940. This court held:

> It is unclear how improvements to the *leased commercial* space could be considered an investment, much less a *personal* investment, where the named lessee was [the corporation] and [the corporate officers] were only guarantors on the Lease and officers of the corporation. Accordingly, we hold that [the corporate officers] were not "consumers" as defined in HRS § 480-1.

Id. at 436, 114 P.3d at 942.

Here, we cannot conclude that Maria was a "consumer" based on her contribution of personal assets to facilitate GPLLC's purchase and operation of RLS. RLS was clearly a commercial operation being acquired by GPLLC. GPLLC's acquisition of RLS was a commercial transaction and was not transformed into a consumer transaction because the corporation's principals provided the capital needed by GPLLC to complete the transaction. Extending the definition of "personal investment" to include money or property associated with the acquisition of a commercial venture – through an entity formed for the purpose of acquiring and operating that business – would be contrary to the

intent of HRS § 480-1.[8]  Accordingly, we conclude that Maria did not have standing to bring claims under HRS § 480-2, and the Circuit Court did not err by granting summary judgment as to Count VII.

Notwithstanding a reference to HRS Chapter 481A, the Second Amended Complaint failed to allege that the defendants engaged in any of the trade practices concerning goods or services prohibited by and considered to be deceptive pursuant to HRS § 481A-3 (2008).[9]  Furthermore, no evidence of such deceptive

---

[8]      HRS § 480-1 was amended in 1990 with the addition of "personal" to modify "investment."  See Cieri, 80 Hawai'i at 68, 905 P.2d at 43.  The legislative history of HRS § 480-1 does not suggest that the "personal investment" portion of the "consumer" definition applies to the sale of a business by one owner to the next:

> Your Committee believes that one of the purposes for the definition of "consumer," as formulated in Section 480-2, was to address the consumer investment fraud situation, such as the Rewald situation.  However, the language of the definition may be overbroad and not limited to situations of investment fraud schemes to consumers. Therefore, your Committee has amended the bill by inserting the word "personal" before the word "investment" to clarify that the provision is to protect individual consumers, rather than businesses.

H. Stand. Comm. Rep. No. 716-90, in 1990 House Journal, at 1113.

[9]      HRS § 481A-3 provides:

> **HRS § 481A-3 Deceptive trade practices.**  (a) A person engages in a deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person:
> (1)    Passes off goods or services as those of another;
> (2)    Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3)    Causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;
> (4)    Uses deceptive representations or designations of geographic origin in connection with goods or services;
> (5)    Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(continued...)

trade practices was presented in opposition to Rnic's summary judgment motion and, thus, it is clear that no genuine issue of material fact exists as to whether Rnic violated the statute.

For these reasons, the Circuit Court did not err by granting summary judgment in favor of Rnic on Maria's unfair and deceptive trade practice claims in Count VII.

6.    The Spoliation of Evidence Claims

In Matsuura, 102 Hawai'i at 168, 73 P.3d at 706, the supreme court declined to resolve whether Hawai'i law recognizes spoliation of evidence as a tort, but noted in that a few other jurisdictions have recognized such a cause of action:

> The few jurisdictions that recognize a cause of action for intentional spoliation . . . of evidence require a showing of the following elements:
>
> (1)    the existence of a potential lawsuit;
> (2)    the defendant's knowledge of the potential lawsuit;
> (3)    the intentional destruction of evidence designed to

---

[9](...continued)
> (6)    Represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;
> (7)    Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;
> (8)    Disparages the goods, services, or business of another by false or misleading representation of fact;
> (9)    Advertises goods or services with intent not to sell them as advertised;
> (10)   Advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;
> (11)   Makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; or
> (12)   Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
>     (b) In order to prevail in an action under this chapter, a complainant need not prove competition between the parties or actual confusion or misunderstanding.
>     (c) This section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State.

disrupt or defeat the potential lawsuit;
(4)     disruption of the potential lawsuit;
(5)     a causal relationship between the act of spoliation
        and the inability to prove the lawsuit; and
(6)     damages.

For a claim of negligent spoliation of evidence, jurisdictions generally require that the plaintiff prove:

(1)     the existence of a potential civil action;
(2)     a legal or contractual duty to preserve evidence
        that is relevant to the potential civil action;
(3)     destruction of that evidence;
(4)     significant impairment in the ability to prove
        the lawsuit;
(5)     a causal relationship between the destruction of
        evidence and the inability to prove the lawsuit,
        and
(6)     damages.

Id. at 166-67, 73 P.3d at 704-05 (citations omitted, format altered). Based on the above, the Matsuura court concluded that the plaintiffs would be unable to state a claim even if it existed in Hawai'i. Id. at 168, 73 P.3d at 706. The court held that the alleged destruction of evidence did not cause the plaintiffs' inability to prove their tort claim where the plaintiffs had pointed to evidence other than the destroyed evidence in order to prove their underlying claim. Id. Thus, the facts alleged could not support a spoliation claim. Id.

Here, the Pleho Parties have not alleged that Rnic destroyed evidence, only that he "failed and refused to produce" evidence. The Second Amended Complaint alleges that "[the Lacy Parties] and [Rnic] intentionally and/or negligently failed and refused to produce all documents and other evidence in their custody and control, to include but not limited to, agreements, drafts of agreements, correspondence, RLS financials, phone records, and emails." It further alleges that "[the Lacy Parties], and/or their employees, and/or agents, intentionally and/or negligently destroyed electronically relevant evidence

47

contained within [Lacy's] computer hard drive[.]" Finally, it alleges that "[a]s a direct and proximate result of [the Lacy Parties'] and [Rnic's] intentional and/or negligent destruction of relevant evidence as described herein, [the Pleho Parties'] lawsuit has been and continues to be disrupted[.]"

In their memorandum in opposition to Rnic's motion for summary judgment, the Pleho Parties pointed to various exhibits that do not appear to support the Pleho Parties' purported spoliation claims. Moreover, even assuming that such causes of action were to become recognized in Hawai'i, the Pleho Parties failed to allege, much less present evidence that could establish, essential elements of such claims, including that Rnic knew of a potential lawsuit and/or had a legal or contractual duty to preserve, and, importantly, a causal relationship between the alleged acts of spoliation and the inability to prove the lawsuit. Like the plaintiffs in Matsuura, the Pleho Parties pointed to evidence other than the allegedly destroyed evidence to prove their underlying fraud claims. Matsuura, 102 Hawai'i at 168, 73 P.3d at 706. Thus, regardless of whether Hawai'i law might recognize spoliation of evidence as a tort, we conclude that the Circuit Court did not err in granting Rnic summary judgment as to Maria's spoliation claims in Counts IX and X.

7.   Punitive Damages

Because we conclude that the Circuit Court did not err in granting summary judgment as to Maria's other claims against Rnic, we necessarily conclude that Maria cannot recover punitive damages against Rnic.

C.   The Lacy Parties' Motion to Dismiss

In its July 29, 2009 Order, the Circuit Court granted the Lacy Parties' HRCP Rule 12(b)(6) motion to dismiss certain counts of the Second Amended Complaint as against the Lacy Parties.[10]   However, in some instances, it appears that the Circuit Court reviewed the "record and file of the case," which included written declarations, deposition transcripts, and other matters outside the pleading.  Thus, we consider the Lacy Parties' motion and the subsequent ruling under the framework of an HRCP Rule 56 motion for summary judgment, as well as under HRCP Rule 12(b)(6).  See generally Towse v. State, 64 Haw. 624, 647 P.2d 696 (1982).

1.   Conspiracy to Commit Fraud

As stated above:

> The Hawai'i Supreme Court has defined civil conspiracy as the combination of two or more persons or entities by concerted action to accomplish **a criminal or unlawful purpose**, or to accomplish some purpose not in itself criminal or unlawful **by criminal or unlawful means**.  The supreme court explained that [c]ivil conspiracy does not alone constitute a claim for relief.  In other words, concerted action is not enough.  A civil conspiracy claim must include either that the alleged conspirators had a **criminal or unlawful purpose** for their concerted action or that the alleged conspirators used **criminal or unlawful means** to accomplish a lawful objective.

Miyashiro, 122 Hawai'i at 482, 228 P.3d at 362 (emphases in original, internal citations and quotation marks omitted); see also Adams, 132 Hawai'i at 490, 323 P.3d at 134 ("[T]here can be

_____

[10]    As clarified in the Circuit Court's July 29, 2009 Order, Counts I, IV, V, VI, IX, and X were dismissed in their entirety with respect to the Lacy Parties.  GPLLC's fraud claims in Counts II and III, legal malpractice claim in Count VIII, and punitive damages claim in Count XI remained.  Goran and Maria's fraud claims in Counts II and III, as well as their legal practice claim in Count VIII, were dismissed as to the Lacy Parties, leaving only their claims for unfair and deceptive trade practices in Count VII and punitive damages in Count XI.

no civil claim based upon a conspiracy alone.") (quoting <u>Ellis</u>, 51 Haw. at 57, 451 P.2d at 822).

The Second Amended Complaint alleged that both Rnic and Lacy failed to disclose the extent of Lacy's involvement in the Rnic/Rullo negotiations and that Rullo's proposed purchase price was only $800,000. It was undisputed that neither Rnic nor Lacy mentioned the Rnic/Rullo negotiations to the Plehos. The Second Amended Complaint also alleged that Rnic and Lacy had misrepresented to Goran "that the fair market value of RLS was $2.0 million, and that because it was such a unique business no appraisal was possible, and that $1.5 million was a fair price, and Plaintiff GORAN PLEHO relied on same."

However, as noted above, the plaintiffs failed to allege or provide any evidence that Lacy acted in concert with Rnic to fraudulently induce them. "[M]ere acquiescence or knowledge is insufficient to constitute a conspiracy, absent approval, cooperation, or agreement." <u>Tour2000 Co.</u>, 2009 WL 3437431, at *9 (citation omitted); <u>see</u> <u>also</u> <u>Zimmerman</u>, 38 Haw. at 226 ("The mere knowledge, acquiescence, or approval of the act, without co-operation or agreement to co-operate, is not enough to constitute one a party to a conspiracy. There must be intentional participation in the transaction with a view to the furtherance of the common design and purpose.") (footnote and citation omitted). There is no evidence in the record that the

Lacy Parties intentionally participated in the sales transaction with a view to the furtherance of the common design and purpose.

Thus, we conclude that the Circuit Court did not err in granting summary judgment as to the Pleho Parties' claim of conspiracy against the Lacy Parties in Count I.

2.   Fraud and Fraud in the Inducement

With respect to Goran and Maria's fraud claims, the Lacy Parties argued, in their motion to dismiss the Second Amended Complaint, that as individuals who are not parties to the purchase agreement, Goran and Maria are not real parties in interest and have no right to bring claims.  In addition, the Lacy Parties argued that, as GPLLC was the purchaser of RLS, Goran and Maria could not prove that they suffered any damages arising from the Lacy Parties' alleged fraud.  As no other arguments were presented, it appears that the Circuit Court granted the Lacy Parties' request for dismissal of Goran and Maria's fraud claims on these grounds.

While we agree that the Plehos as individuals are not real parties in interest as purchasers of RLS, in the Second Amended Complaint the Plehos alleged, *inter alia*, that they made an initial down payment of $378,000 on behalf of and for the benefit of GPLLC by transferring to Rnic the three Properties they owned as individuals.  Thus, viewing the Second Amended Complaint in a light most favorable to Goran and Maria, we cannot conclude that it appears beyond doubt that the Plehos can prove no set of facts in support of their claim that they were real parties in interest and suffered damages in conjunction with,

*inter alia*, the transfer of these Properties. See, e.g., Kealoha, 131 Hawai'i at 74, 315 P.3d 213 (stating the standard for dismissal for failure to state a claim). As the allegations of the Second Amended Complaint were otherwise accepted as true for the purposes of the Lacy Parties' motion to dismiss, we must conclude that the Circuit Court erred in dismissing Goran and Maria's fraud claims on the grounds that they can prove no set of facts entitling them to relief. We note, however, that our ruling is without prejudice to the Lacy Parties asserting on remand that Goran and Maria's fraud claims are barred by the jury's verdict, or that the Lacy Parties are otherwise entitled to judgment as a matter of law, on grounds other than those asserted in the motion to dismiss.

As noted above, GPLLC's fraud claims were not dismissed in the July 29, 2009 Order.

### 3. Gross Inadequacy of Consideration

For the reasons stated in Section IV.B.3, above, we conclude that the Circuit Court did not err in granting summary judgment in favor of the Lacy Parties as to the Pleho Parties' gross inadequacy of consideration claim in Count IV.

### 4. IIED and NIED

In dismissing GPLLC's claims in Counts V and VI, the Circuit Court observed that mental distress cannot be suffered by a corporation. We agree.

With respect to Goran and Maria's IIED claims against the Lacy Parties, even assuming, *arguendo*, that all of the Plehos' allegations are true, we cannot conclude that reasonable

people could construe Lacy's conduct as "beyond all possible bounds of decency" or "utterly intolerable in a civilized community" as is required under our case law. Simmons, 130 Hawai'i at 332, 310 P.3d at 1033.

With respect to Goran and Maria's NIED claims against the Lacy Parties, as stated above, the Pleho Parties do not cite to any Hawai'i case law supporting recovery for NIED based entirely on a commercial transaction, and we find none.

Thus, we conclude that the Circuit Court did not err in dismissing the Pleho Parties' IIED and NIED claims in Count V and VI against the Lacy Parties.

5.    Unfair and Deceptive Trade Practices

The Circuit Court properly dismissed GPLLC's unfair and deceptive trade practices claims, stating:

> Count VII for unfair and deceptive trade practices can not [sic] stand on behalf of [GPLLC], because a claim for unfair and deceptive trade practices is reserved by statute for consumers. . . . A corporation is not a natural person and does not have standing to bring a claim for unfair and deceptive trade practices under the statute.

HRS § 480-13 (2008) provides, in relevant part, the cause of action for violations of Chapter 480:

> (a) Except as provided in subsections (b) and (c), any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:
> (1) May sue for damages sustained by the person. . .
>
> (b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:
> (1) May sue for damages sustained by the consumer. . .

HRS § 480-2 (2008) provides, in relevant part (emphasis added):

> (a)   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.

. . . .
(d) No person other than a **consumer**, the attorney general or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section.

HRS § 480-1 defines "consumer" and "person" as follows:

"Consumer" means a **natural person** who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services or who commits money, property, or services in a personal investment.
. . . .
"Person" or "persons" includes individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, **limited liability companies**, and incorporated or unincorporated associations, existing under or authorized by the laws of this State, or any other state, or any foreign country.

HRS § 480-1 (emphases added). GPLLC did not have a cause of action under HRS Chapter 480 because it is not a "natural person," and is thus not a "consumer" under HRS § 480-1 (2008).

6.    Legal Malpractice

In their motion to dismiss, the Lacy Parties argued that because Goran and Maria's "claim for legal malpractice relates to the purchase" of RLS, and Goran and Maria were not parties to the Sale Agreement, they suffered no damages arising out of the purchase, and any damages were suffered solely by GPLLC. Thus, the Lacy Parties contended, Goran and Maria's "failure to plead an essential element of their claim should prompt dismissal of Count VIII." As explained in the July 29, 2009 Order, the Circuit Court agreed and, for that reason, dismissed the individual plaintiffs' malpractice claims and allowed only GPLLC's malpractice claim to stand.

We conclude, however, that the Circuit Court erred when it dismissed Goran and Maria's legal malpractice claims against the Lacy Parties.

> The elements of an action for legal malpractice are: (1) the parties had an attorney-client relationship, (2) the defendant committed a negligent act or omission constituting breach of that duty [to use such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake], (3) there is a causal connection between the breach and the plaintiff's injury, and (4) the plaintiff suffered actual loss or damages.

Thomas v. Kidani, 126 Hawai'i 125, 129, 267 P.3d 1230, 1234 (2011) (citations omitted).

First, it appears that there were genuine issues of material fact as to whether Lacy formed an attorney-client relationship with Goran and Maria, as well as with GPLLC. Although Goran signed an engagement letter with L&J on behalf of GPLLC for "general representation," there is evidence in the record that this letter was signed in February 2006 and backdated to August 9, 2005. Even earlier than that, however, on July 11, 2005, Goran and Maria met with Rnic and Lacy to discuss the purchase of RLS. Lacy testified during his deposition that he remembered telling Goran that he should have his own attorney, but Rnic said he did not want a lawyer, and that Lacy should be Goran's lawyer. Lacy also testified:

> And I thought about it a moment. And all of the terms and conditions of the contract were already agreed upon. It was a matter of actually writing out the contract. And so I -- I don't recall exactly how it happened, but I told Mr. Pleho I could represent him if he wanted me to.

Goran testified at his deposition that he knew that Lacy was Rnic's attorney when he retained Lacy, but that he did not know the extent of Lacy's representation of Rnic with regard to RLS. He also testified that he expected that Lacy would protect his and Maria's interests. Maria also stated that she

55

understood Lacy to be their lawyer and that he would protect their interests.

In the Second Amended Complaint, the Plehos alleged, *inter alia*, that Lacy never advised them that they should retain another lawyer, did not disclose the extent of his representation of Rnic, did not disclose that he had previously represented Rullo in conjunction with a possible purchase of RLS or that the purchase price would have been $800,000 in cash, misrepresented the value of RLS and said that no appraisal was possible, and advised them to close the purchase without an appraisal. The Plehos alleged that they would not have proceeded with the purchase if Lacy (or Rnic) had disclosed the aborted Rullo transaction and terms. As discussed above, Goran and Maria also alleged that they, as individuals, suffered damages because they contributed the Properties to be used as part of GPLLC's payment for RLS.

Thus, we conclude that the Circuit Court erred when it dismissed Goran and Maria's legal malpractice claims against the Lacy Parties in Count VIII. As we noted with respect to Goran and Maria's fraud claims against the Lacy Parties, our ruling is without prejudice to the Lacy Parties' asserting on remand that the Plehos' malpractice claims are barred by the jury's verdict, or that the Lacy Parties are otherwise entitled to judgment as a matter of law.

7.    Spoliation of Evidence

The Pleho Parties failed to properly allege or provide any evidence that the destruction of evidence resulted in their inability to prove their other claims. See Matsuura, 102 Hawai'i at 167, 73 P.3d at 705 ("both intentional and negligent spoliation of evidence require:  (1) the destruction of evidence; (2) the disruption or significant impairment of the lawsuit; and (3) a causal relationship between the destruction of evidence and the inability to prove the lawsuit") (footnote omitted).  Thus, regardless of whether Hawai'i law recognizes spoliation of evidence as a tort, the Circuit Court did not err in entering judgment as a matter of law as to the spoliation claims in Counts IX and X.

D.    Lacy Parties' Motions for Partial Summary Judgment

The Pleho Parties challenge the Circuit Court's February 23, 2011 order granting summary judgment in favor of the Lacy Parties and against Goran and Maria on their unfair and deceptive trade practices claims in Count VII, as well as the Circuit Court's May 12, 2011 order granting summary judgment in favor of the Lacy Parties and against Goran and Maria on their punitive damages claims in Count XI.

On appeal, the Plehos appear to argue that the practice of law is a "trade or commerce" to which HRS § 480-2 applies, contending that "a lawyer who deceives a client about the value of a company he wishes to purchase, has not only committed malpractice, but also a deceptive trade practice."  This argument also seems to raise for the first time on appeal the allegation

that Lacy engaged in unfair or deceptive trade practices within the context of the practice of law as the record reflects that the Pleho Parties had previously raised their Chapter 480 claims against Lacy only within the context of his role in the commercial purchase and sale of a business. "Legal issues not raised in the trial court are ordinarily deemed waived on appeal." E & J Lounge Operating Co. v. Liquor Comm'n of City & Cty. of Honolulu, 118 Hawai'i 320, 339, 189 P.3d 432, 451 (2008) (citation omitted). Thus, we need not address this issue.

Moreover, we reject the Plehos' argument that Chapter 480 applies to Lacy's conduct in his capacity as a practicing attorney in the instant case. As other jurisdictions have noted,

> The majority of jurisdictions that have addressed this issue have held that the regulation of attorneys does not fall within the ambit of consumer protection laws. A minority of jurisdictions has carved out an exception for entrepreneurial aspects of the practice of law, such as advertising and debt collection, while recognizing that claims which allege negligence or legal malpractice are exempt from the consumer protection laws.

Beyers v. Richmond, 937 A.2d 1082, 1086 (Pa. 2007) (plurality opinion) (holding that the supreme court's authority to supervise the conduct of attorneys is "exclusive, not concurrent[,]" and that Pennsylvania's consumer protection law does not apply to conduct that is subject to the Pennsylvania Rules of Professional Conduct and Rules of Disciplinary Enforcement). See also Averill v. Cox, 761 A.2d 1083, 1088 (N.H. 2000) (holding that the practice of law is exempt from New Hampshire's consumer protection law because regulation of the same under the court's professional conduct committee "is comprehensive and protects consumers from the same fraud and unfair practices as [the

consumer protection law]"); <u>Short v. Demopolis</u>, 691 P.2d 163, 168 (Wash. 1984) (holding that, while the Washington Consumer Protection Act (**CPA**) applies to certain "entrepreneurial aspects of legal practice – how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients," it does not apply to claims that "concern the actual practice of law" and "are directed to the competence of and strategy employed by" attorneys); <u>Eriks v. Denver</u>, 824 P.2d 1207, 1214 (Wash. 1992) (clarifying that "[c]laims for malpractice and negligence are not subject to the CPA, since those claims go to the competence and strategy of lawyers, and not to the entrepreneurial aspects of practice").

However, as we are vacating in part the Judgment and remanding the case with respect to Goran and Maria's fraud claims against the Lacy Parties, we also vacate in part the Circuit Court's order and Judgment on their claims for punitive damages in Count XI.

E.   The Lacy Parties' Motion for JMOL

As stated above, at the close of the plaintiffs' case, the Circuit Court granted in part the Lacy Parties' motion for JMOL and entered judgment as a matter of law as to GPLLC's claims for fraud, fraud in the inducement, and punitive damages.

> [T]o constitute fraudulent inducement sufficient to
> invalidate the terms of a contract, there must be (1) a
> representation of a material fact, (2) made for the purpose
> of inducing the other party to act, (3) known to be false
> but *reasonably* believed true by the other party, and (4)
> upon which the other party relies and acts to his or her
> damage.

<u>Exotics Hawaii-Kona</u>, 116 Hawai'i at 285 n.6, 172 P.3d at 1029 n.6 (citation omitted).

> A motion for JMOL may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Lahaina Fashions, 131 Hawai'i at 453, 319 P.3d at 372 (citation and internal quotation marks omitted).

The Lacy Parties principally argued that, with respect to the fraud claims, "there's no proof that the plaintiff was damaged." As set forth in the Lacy Parties' written motion for JMOL, and as presented at the hearing on the motion, this argument was based in large part on the testimony of GPLLC's valuation expert, who testified on direct examination that he valued a 100% equity interest in RLS at $128,000, but agreed on cross-examination that, in order to obtain the actual value, which is the owner's interest in the property, it was necessary to take the $128,000, and add back in the $1,122,000 for the promissory note, which then totals $1,250,000. In addition, when the Lacy Parties settled with Rnic, they paid $650,000 to obtain, inter alia, a release of Rnic's claims against GPLLC, including all liability on the promissory note. Thus, GPLLC obtained a $1,250,000 business for $452,698 (including the $378,000 down payment from the Properties and $74,698 that was otherwise paid, according to the evidence entered at trial). In addition, the Lacy Parties argued that GPLLC had not otherwise offered evidence establishing the measure of damages necessary to put the plaintiff in the position it would have been had it not been (allegedly) defrauded – such as income projections or other evidence of how the business would have performed but for the

alleged misrepresentations – and thus the Lacy Parties were entitled to judgment as a matter of law on GPLLC's fraud claims.

On appeal, GPLLC argues that it introduced compelling evidence in support of its fraud claims, but fails to cite any evidence at trial that is contrary to the above. Thus, we conclude that the Circuit Court did not err in granting JMOL on the fraud claims, as there was no evidence to support a jury verdict in GPLLC's favor. See Lahaina Fashions, 131 Hawai'i at 453, 319 P.3d at 372.

With respect to GPLLC's punitive damages claim, the Lacy Parties argued that GPLLC failed to present any evidence showing wanton, oppressive and/or malicious misconduct, or gross negligence that would warrant to imposition of punitive damages. The Circuit Court agreed. On appeal, GPLLC argues that "[b]y dismissing fraud and fraud in the inducement, Judge Ibarra cut the heart out of this case" and that "the same evidence [establishing the fraud claims] supported punitive damages" against the Lacy Parties "for aggravated or outrageous misconduct." However, as we have concluded that the Circuit Court did not err in entering JMOL on GPLLC's fraud claims, we further conclude that the court did not err in entering JMOL on its related claim for punitive damages.

F.    Lacy Parties' Motion for Attorneys' Fees and Costs

Regarding attorneys' fees and costs, the Pleho Parties argue on appeal that the Circuit Court erred in awarding attorneys' fees to the Lacy Parties because the Lacy Parties were not the "prevailing party" as to GPLLC's legal malpractice claim.

The Pleho Parties argue that "[s]ince the jury found Lacy guilty of malpractice, and his insurer paid Rnic $650,000 to drop his counter-claims, [the Pleho Parties] were 'the successful part[ies] for purposes of taxing costs and attorney's fees.'"

This argument is without merit. The jury returned a verdict finding that Lacy had breached the applicable standard of care in providing legal services to GPLLC, but that Lacy's breach was not a legal cause of GPLLC's damages. Thus, the jury did not find Lacy liable for malpractice, and the Lacy Parties prevailed at trial. Accordingly, the Circuit Court did not abuse its discretion in awarding attorneys' fees and costs to the Lacy Parties with regard to GPLLC's legal malpractice claims.

However, the January 9, 2012 order awarding attorneys' fees and costs held Goran and Maria jointly and severally liable to the Lacy Parties for the Lacy Parties' attorneys' fees and costs. Because we vacate in part the Judgment and remand for further proceedings, *inter alia*, as to Goran and Maria's legal malpractice claims against the Lacy Parties, we also vacate and remand the attorneys' fees and costs award, to the extent that it held Goran and Maria jointly and severally liable, as it is unclear whether the Lacy Parties will be determined the prevailing party against Goran and Maria, as well as GPLLC, after further proceedings on their remaining claims. The January 9, 2012 order awarding attorneys' fees and costs is otherwise affirmed.

G. The Lacy Parties' Cross-Appeal

In the cross-appeal, the Lacy Parties request that this court reverse the Circuit Court's order denying Motion in Limine No. 2, or, in the alternative, reverse the Circuit Court's admission of Exhibit 27-G(7). The Lacy Parties argue that, under the doctrine of judicial estoppel, the Pleho Parties should have been barred from offering evidence of any loan, debt, note, payment, advance, or other obligation allegedly owed to GPLLC by Goran and/or Maria because neither of the Plehos listed such indebtedness as assets in their bankruptcy schedules. The Lacy Parties contend that GPLLC was offering this evidence to establish certain damages for the amounts it allegedly owed the Plehos, but the Plehos gave sworn statements (the schedules) in the bankruptcy court that they were not owed money from GPLLC so that it would appear that the Plehos had less assets subject to the claims of their creditors.

First, we note:

> The granting or denying of a motion in limine is reviewed for abuse of discretion. The denial of a motion in limine, in itself, is not reversible error. The harm, if any, occurs when the evidence is improperly admitted at trial. Thus, even if the trial court abused its discretion in denying a party's motion, the real test is not in the disposition of the motion but the admission of evidence at trial.

Kobashigawa v. Silva, 129 Hawai'i 313, 320, 300 P.3d 579, 586 (2013).

This court has previously stated:

> Most jurisdictions apply judicial estoppel when, at minimum, the following elements are met:
>
> > (1) The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding;

> (2) the prior inconsistent position must have been accepted by the tribunal; and
>
> (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.
>
> Although Hawai'i courts have not expressly adopted those elements, our case law is generally in accord. See Roxas, 89 Hawai'i at 124, 969 P.2d at 1242; Rosa, 4 Haw. App. at 220, 664 P.2d at 752 ("A party is precluded from subsequently repudiating a theory of action accepted and acted upon by the court.").

Langer v. Rice, No. 29636, 2013 WL 5788676, at *5 (Haw. App. Oct. 28, 2013) (mem.) (citations omitted). Once the requisite elements are met, the trial court has discretion whether to invoke judicial estoppel. Id. at *4.

It appears from the record that the Lacy Parties established each of these elements as the Pleho Parties' position that GPLLC owes money to Goran and/or Maria is factually incompatible with Goran and Maria's failure to identify such indebtedness as an asset on its bankruptcy schedules, the bankruptcy court made various rulings based on the Plehos' assertions concerning their assets and liabilities, and GPLLC (and, on remand, perhaps Goran and Maria), seek to take unfair advantage by using evidence of this indebtedness as a measure of damages for its claims against the Lacy Parties.

It further appears, however, that the Circuit Court erroneously concluded that the issue was a matter of credibility rather than admissibility, and did not reach the exercise of its discretion on whether to judicially estop the Pleho Parties from asserting the factually incompatible position in this case. Thus, we vacate the Circuit Court's ruling on Motion in Limine No. 2 and the admission of Exhibit 27-G(7) to allow the Circuit

Court, in the first instance, to exercise its discretion on the Lacy Parties' request for judicial estoppel.

V.    CONCLUSION

For these reasons, and as set forth above, we affirm in part and vacate in part the Circuit Court's January 9, 2012 Judgment. The Judgment is vacated with respect to the following: (1) Goran and Maria's claims in Counts II, III, VIII, and XI, for relief against the Lacy Parties for fraud, fraud in the inducement, legal malpractice, and punitive damages; (2) the January 9, 2012 award of attorneys' fees and costs to the Lacy Parties to the extent that it held Goran and Maria jointly and severally liable to the Lacy Parties, without prejudice to a renewed motion by the Lacy Parties upon disposition of Goran and Maria's remanded claims; and (3) the Circuit Court's ruling on Motion in Limine No. 2 and the admission of Exhibit 27-G(7) to allow the Circuit Court, in the first instance, to exercise its discretion on the Lacy Parties' request for judicial estoppel. The Circuit Court's January 9, 2012 Judgment is affirmed in all other respects. This case is hereby remanded to the Circuit Court for further proceedings consistent with this Memorandum Opinion.

DATED: Honolulu, Hawai'i, August 26, 2016.

On the briefs:

Peter Van Name Esser,
for Plaintiffs-Appellants/
 Cross-Appellees.

Keith K. Hiraoka,
Jodie D. Roeca,
Norman K. Odani,
(Roeca Luria Hiraoka, LLP),
for Defendants-Appellees/
 Cross-Appellants.

Robert G. Klein,
David J. Minkin,
(McCorriston Miller Mukai MacKinnon),
 and
Sean Claggett,
for Defendant-Appellee DRAGAN RNIC.

*Craig H. Nakamura*
Chief Judge

Associate Judge

Associate Judge